The first case is submitted and we'll move to the second case of the day, which is 19-12-708, United States v. Stapleton. We have Mr. De La Fera here for the appellant, Mr. La Serna here for the appellee. Good morning, Your Honor. Ready, Mr. De La Fera? Go ahead. On behalf of the appellant, also at counsel table is Mr. Alan Kaufman. He was appointed by Judge Middlebrooks on the appeal and he was standby counsel to Mr. Stapleton in the trial court. Your Honor, I guess we should start with the court's request for supplemental briefing on the time that I'd ever gotten such an order to brief an issue from the court, and it seems that it is related. We raised in the initial brief the multiplicity with relation to Stephen Ritty, who is count 10, 32, and 47, and this court asked us to brief whether the encourage of this court's decision in Lopez that defined encourage in the count 10 statute has the definition of encourage to include to help, whether that rendered count 10 multiplicitous with count 47, which is the aggravated felon, aiding and assisting an aggravated felon. And it appears that, in our view, that help does cover aid and assist. So I think just to sort of advance the conversation a bit, I think the government might not dispute that, but they say nonetheless, the sort of the mens rea elements for each of these three buckets of crimes are so even given Lopez and encouragement meaning help, we've still got unique elements for each of these three as they sort of spell out in their supplemental brief, and so you might want to try to tackle it. And I'm happy to do that. I mean, what they're arguing is that, you know, these separate counts have different elements, if you will, but it seems to me that the count 10, which is in violation of the law, is similar to without prior authorization, as in count 32, and the bringing of a of an aggravated felon. These are all violations of the law. So I mean, I think it does like at a certain level of generality, it does seem similar, but the government has this and maybe it's excruciatingly detailed or formalistic or something. But I mean, they seem to have found a pathway by which you can be, for instance, without prior authorization and yet not in violation of the law. And I looked at that. I looked at the CFRs that they cited, and it seems to me that the CFRs that they've cited to show that you can be in violation of the law without prior authorization or vice versa, I'm trying to, you know, envision what they're saying, is that the CFR that they the CFRs that they cited deal with receiving travel authorization prior to entry into the United States. And it looks to me like these CFRs only reflect the logistical realities of the different modes of travel, that if you're if you're coming by air or by sea, it's pretty much understood you're going to be coming, you know, on a conveyance of some kind of vessel, an aircraft. So you have to have the prior authorization prior to boarding that conveyance, whereas land entry requires that you receive the authorization when you arrive. And that that to me, it really makes all the difference because if you're if you're coming from Europe, or even Canada, and you're coming from, you're coming by aircraft, you know, you're the law tells you have to have the authorization before you board that aircraft. But if you're coming, if you're walking, either over the Canadian border or the Mexican border, the only land entries that you can come to the United States, or you're coming by car, you're not going to have that that that ticket or that, you know, that pre arranged mode of travel. So I don't see how their, their logic really, really holds up because looking at it, it's really just the timing of when you get the authorization that applicants arriving by air or sea ports must receive the travel authorization prior to boarding a carrier, I guess carriers, the better description, whereas arriving by land ports of entry, you receive travel authorization prior to application for admission. So I don't think that the government's, you know, their arguments to how you could violate one and not the other. I don't think that their citation really answers that question. So can you just explain to me sort of why that is? I mean, I take your point. I think you're exactly right, that it just sort of describes the sort of the necessary logistics of the situation. But why is it for someone coming by land from a country with respect to whom we have this visa waiver program or whatever, isn't in the country without prior authorization and yet not in violation of law? I mean, it seems to me that like that may seem a little formalistic, but that that person probably does fit that category. Well, it appears under the CFR that the someone, an alien, an alien intending to travel by land to the United States must receive a travel authorization prior to application for admission. So it seems to me it's just the timing of how you do it. But if it turns out that you brought that person here, that person, the person via land from a country with whom we have a waiver visa waiver program who is here without prior authorization and yet not in violation of law, and you brought them here for commercial gain, then all of a sudden now you're in count 32 land, right? Well, you're saying that this smuggler brought them to Mexico from another country to come to the to the United States? I guess I think I'm saying the smuggler brought them into the US from Mexico by land. And so they are here without prior authorization and yet themselves not in violation of law of the law. The way I read it, they would still have to receive authorization prior to application for admission. I mean, that's the way I'm reading the CFR. And, you know, I was, you know, when I read the government's brief, I was certainly digging in and trying to understand, you know, what their, you know, what their argument was and what their I guess their hypothetical was. And I just I think that I don't see a real difference other than, as I said before, the logistical realities of the different modes of travel. Okay. And so I mean, if the court has any more questions on that issue, I mean, I did raise some other issues that I think are of merit and of importance to speed. Yeah, you've only got three and a half minutes. So you can at least as far as I'm concerned, you can talk about the speedy, the speedy trial issue. I think that the magistrate court erred in determining that Mr. Stapleton had to show actual prejudice. I mean, I think I think the the the emails that were submitted to the magistrate show that that the government's effort to bring Mr. Stapleton to the United States and to trial after the indictment was was handed up in September of 2014 was just inadequate. I mean, one of the most telling of aspects of that is that in an email in February of 2015, which is months after the indictment is handed up, one of the agents is bemoaning the fact that the Bahamas are going to require first person affidavits from each alien and basically says this is going to be a losing fight. It's time consuming and costly. So they basically threw up their hands. Then when they somehow learned that Mr. Stapleton was in Jamaica, then they wanted to try to see and that's a year later in 2016. They want to see if they can get him from Jamaica and they find out they'll have the same challenge with the first person affidavits. It finally dawns on them in well, they tried the lure in 2017. But the interesting thing from my perspective is, is they recognized in 2016 that they could put an Interpol notice, a red notice that would alert international authorities that Mr. Stapleton was wanted in the United States. They discussed that in June of 2016, but they didn't enter it until May of 2018. So in total, three years, 10 months and 23 days between indictment and Mr. Stapleton's initial appearance elapsed. Let me ask you this question about the speedy trial issue. Does your whole argument turn on whether you have to show actual prejudice or not? Or put it, put in the question more awfully, can you show actual prejudice here, assuming that you have to? Can I show prejudice? Yeah, actual prejudice. What was presented to the magistrate, I stand by it, is that Mr. Stapleton had, was pursuing a public authority defense. And he wanted to show that he had had contact with an agent in the Bahamas. And because of the passage of time, and I think this was undisputed below, the phone records were gone. So he did not have the ability to present phone records to the agent. And I think that's the prejudice that he suffered as a result of the delay. What would have been revealed on those missing phone records that would establish prejudice? That he had had extensive contact with the agent in support of his public authority defense. I have 16 seconds. I do want to alert the, present to the court the sufficiency of the I think this court's, well it's an unpublished decision in Lockett, goes through two separate situations. One out of the Fifth Circuit where a prior conviction was proved up by fingerprints. And a case out of the Tenth Circuit where there was no fingerprint evidence. And even though there was evidence of similarity between the defendant who was being And I think it's similar to our case where all we had in the New Mexico conviction was first name, last name, and year of birth. Let me ask a quick question. Was there a contemporaneous objection on this point? There was not. And so I'd ask the court to review this for plain error. I think the error was plain. And I think that Mr. Stapleton suffered prejudice from it because he was basically convicted of an offense for which there was insufficient evidence. So I see him out of time. Okay, very well. You have four minutes remaining. Mr. Lacerna, let's hear from you. Good morning, your honors. And may it please the court. My name is Peter Lacerna and I represent the United States. So I just wanted to start off with the point that Judge Mark Newsome made. I apologize. You never need to apologize for calling me Judge Mark. That the hypotheticals that were raised in the government's brief were formalistic, or I think you might put it as made in excruciating detail. There's two points in that regard. For the first point, I would note that under Hassoun, this court held that the question is, can a defendant hypothetically violate one statute without necessarily violating another statute? The question is not, can a defendant hypothetically violate one statute in a way that will likely result in prosecution or in a likely fact pattern or anything like that. I think that takes the Blockburger test a little too far. The second point I would make is that these immigration offenses are sometimes prosecuted in unlikely scenarios that are difficult to anticipate. For example, this court in Zayas Morales dealt with the situation where defendants were transporting Cuban refugees here for the express purpose of applying for asylum. Many described that as a humanitarian effort, and yet the defendants were prosecuted. In Dominguez, for example, the defendant was a prominent sports agent who openly brought the Cuban baseball players here to train and to live here openly and to apply for asylum again or some sort of legal status here. Many people would think that these are sort of bad law school exam hypotheticals, but they were actual prosecutions. So it's difficult to anticipate all of the factual scenarios where these offenses might be prosecuted. So I would just rely on those two points to address the situation that the hypotheticals are somewhat formalistic, and I agree. But the point remains that it is possible to violate one statute without necessarily violating the other. And then moving on to the speedy trial issue, we argued in our brief that Stapleton has waived any argument about actual prejudice. That was not addressed in their opening brief. And in fact, the magistrate judge, I think, made a ruling that really definitively rejected that argument. Below, Stapleton tried to argue that the lapse of time resulted in the phone records being expiring or no longer being available. I'm confused on this. The magistrate judge addressed the issue. Yes, Your Honor. So where was the waiver? The waiver was when it wasn't raised on appeal here. The failure to waive it on appeal in the circuit or the failure to take an objection from the magistrate judge to the district court? The failure to address it on appeal at the 11th Circuit. Okay. But just getting to the substance of the argument itself, if Your Honors were inclined to address it, Mr. Stapleton did argue that the phone records are no longer available. And he argued that they would have showed extensive contact between him and a HSI agent who was Natasha in the Bahamas. In response, the government conceded that the special agent and Stapleton had communications. So those phone records would not have helped in any regard. There was no dispute that they had communications. The number of communications wouldn't have reflected the substance of the communications, which was what I think Stapleton's point really was. And of course, we dispute that anybody in the Bahamas from the United States government was authorizing Mr. Stapleton to smuggle dozens or hundreds of aliens into the Bahamas. But otherwise, any other claim or argument of prejudice was just speculative. In any event, that was waived as we argued here below. As we argued on appeal. I apologize. The other point I would make, and I just want to briefly address this point about the agents bemoaning the effort to have to obtain first person affidavits from all of the aliens in this case. That was a, you know, a candid remark that was probably best left unsaid. However, you know, the fact is that they followed up with that by very diligently trying to get affidavits from everybody involved in these smuggling events. Let's accept for the purposes of my question that they were diligent in trying to get the affidavits. There comes a point, however, when they strike out in that regard. And there's still a substantial gap of time, more than a year, I think, that you can correct me on the timeline, between when they abandoned trying to obtain affidavits from smuggled aliens, and they actually got them back from Germany. What did they do during that period of time that actually revealed diligence? Right, so they were continuing to monitor Stapleton. For example, in 2007, they saw that Stapleton traveled to, I'm sorry, 2017, they saw that Stapleton traveled to Jamaica. So during this time period, they were continuing to monitor his international movements in the hope that he would travel to an extradition friendly country, which he did eventually. So the beginning, middle, and end of what they did was monitor, perhaps, to see if he moved from point A to point B on the map. In addition to trying to obtain all of the necessary first person affidavits. Right, but there came a point when they abandoned doing that. I don't know if that's reflected in the record, Your Honor. You know, it seems clear that they, you know, decided that that was going to be a viable effort, but I don't know that there's anything in the record that says that, you know, we're no longer pursuing that. Let's just assume for the purpose of the question that at some point they stopped. How much time elapses from the time they stopped getting affidavits to the time that he's actually extradited from Germany? I think it was about two years or so, Your Honor. We have emails discussing, I believe in May or June of 2016, we have emails. So let's assume for the purposes of my question that a period of two years elapses. I just want to be very clear on what it is they do during that two-year period that would fall into the category of diligently seeking to get him. They tried to get him out of the Bahamas. They couldn't. They couldn't get him out of Jamaica. They monitor his movement. How do they monitor the movement? It's not clear for me. They receive... On this record, can we tell what it is they did to monitor the movement? Yes, Your Honor. There are emails showing that they were receiving API query database hits. Translate that in English for me. API is a sort of law enforcement database that they were monitoring to check his movements. The other point is that he was in communication with a special agent, Elizabeth O'Connor, the attache in the Bahamas. That, I think, is also on the record. They also explored the possibility of luring him to another country during that time frame that you're discussing, that two-year period where they sort of... It seems clear that they're not going to be able to extradite him. So that's when they're also discussing the idea of luring him to other countries. And that is also not viable as they looked into. But the point is that should it really have taken that long? Couldn't the agents have been a little bit quicker, a little bit more diligent in attempting to do this? Your Honor, the first that I have is that from February 2015 is the first time that the prosecutor informs the agents that first-person affidavits are going to be required after she is conferred with the attorney from OIA, from the Office of International Affairs, after the last landing for which Mr. Stapleton was prosecuted. So that second landing took place in October of 2013. And it wasn't until February 2015 that there's evidence that the government knew that they would need to obtain these first-person affidavits. So I think to go further on that point, I think there's been some argument made below and here that the government was required to obtain first-person affidavits, I think, from the moment that these people landed on shore at the United States. To do some, oh, I apologize. I thought you were about to ask a question. Oh, no, no, no. Sorry. So I think there's been some argument that they should have been required to obtain these first-person affidavits immediately. I think that is the sort of extraordinary effort that this court has rejected as being required. Under cases like BAGA and other cases that are cited in my brief. But it's unreasonable to expect that the moment that these aliens land on the United States, one, that the agents who interact with them are going to know that Stapleton is the ultimate person in charge of the smuggling. And two, more importantly, that they're going to know the intricacies of extradition with the Bahamas and that they're going to require first-person affidavits. So I think the facts don't bear that out. And I think that's the sort of extraordinary effort that this court has always held the government is not required to undertake for the speedy trial analysis. With regard to the last point that Stapleton raised today, as he noted, there was no contemporaneous objection to the sufficiency of the evidence. So there's a plain error standard. And more importantly, this court, I don't think, has ever held that fingerprint or other physical evidence is required to show that a criminal judgment belongs to a person. Of course, that's better evidence. But there's nothing to suggest that the lack of fingerprints will require a finding of insufficient evidence. And I would also point out that the cases cited in Stapleton's briefing are distinguishable for a number of reasons. First and foremost, because the defendants in those cases actually disputed that a person in the criminal judgment was the same as them. And secondly, there were some important inconsistencies in those cases with the judgments. For example, some of them had aliases. Some of them had the incorrect spelling of the defendant. Some of them had incorrect birthdates. None of that is present here. The Steve Ritty that's listed in the criminal judgment has the same name, same birth year as the Steve Ritty that was smuggled into the United States. They're both from Jamaica, and they're both inadmissible aliens as reflected in all the documents that were entered into evidence. So I believe the evidence was sufficient, especially when looking at the evidence in the light most favorable to the government and drawing all reasonable There are no other questions. Yep. Very well. Thank you so much. Yes. The government rest lines briefs. Thank you, Your Honor. And we ask that the Stapleton's conviction and sentence be affirmed. Thank you. Thank you, Mr. Delaferri. You've got four minutes remaining. Thank you. Thank you. To address this issue of waiver with regard to actual prejudice, the law is that if the defendant can show the first three Barker-Wingo factors weigh heavily against the government, then the defendant doesn't need to show actual prejudice. So by challenging the magistrate's order and finding that the government could have been more diligent, but they're not going to weigh it very heavily against the government, means that Mr. Stapleton had to show actual prejudice. I think by challenging that, I'm, if so facto, raising the argument. So I don't think it's been waived. And I did in response to the government, I pointed that out. So I don't think there's been a waiver at all. I'm challenging the magistrate's decision with regard to the first three Barker-Wingo factors. Back to the multiplicity, I'm not sure. I mean, the government seems to be arguing that in a Blockburger analysis, we don't engage in hypothetical factual scenarios, but that's exactly what they're doing in their brief with this CFR argument that they're making. So I'm not sure that that really goes to the core of what this court is looking at with regard to and the Blockburger analysis in relation to that. The government is pointing out in the count 47 argument, the sufficiency of the evidence argument, that we had in the New Mexico judgment, we have Stephen as the first name, Ritty is the last name, and a birth date of 1962. And in the I-23, it's Stephen Anthony Ritty. And I would note that the judgment, the New Mexico judgment had a social security number for the Stephen Ritty that was convicted in New Mexico on the I-213. There is a space for social security number, and there's nothing in it. So there's nothing in the A file that was presented as evidence of the man who came over on the trip that alleges to Mr. Stapleton. Nothing in the A file that has anything about a social security number, yet in the New Mexico judgment, there's a social security number. So there are, other than the first and last name and the date of birth, and I guess the country of origin, because there is something in the New Mexico judgment about holding him for Jamaica, there's nothing that connects the two. And I think when this court in Lockett, understanding it's an unpublished decision, when the court looked at the Fifth Circuit case, and the name escapes me just now, but I'll get it for you, Lampton, and compared to the Green case in the Tenth Circuit case, what happened here is so much more similar to what happened in the Tenth Circuit case, because there was an alias for the alias used the defendant's name as an alias. So there was indicia that this was the same person, but the Tenth Circuit and this court in Lockett seemed to agree that that was just not sufficient to say beyond a reasonable doubt that the person in the conviction is the person, in this case, Mr. Ritty, the alien who came over. So with that, I haven't been able to address all issues in my brief, but I ask the court to vacate Mr. Stapleton's convictions and sentences. Thank you. Very well, and Mr. Delaferro, we see that you were court appointed. We certainly appreciate you taking the appointment. You've discharged your obligations well. Well, thank you very much. It's been a pleasure and a privilege. All right, that concludes the hearing.